# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

JAYDEE THOMPSON,
      Petitioner,

Case No. 1:11-cv-312

vs.

Barrett, J.
Litkovitz, M.J.

WARDEN, WARREN
CORRECTIONAL INSTITUTION,
      Respondent.

**REPORT AND
RECOMMENDATION**

Petitioner, an inmate in state custody at the Warren Correctional Institution in Lebanon,

Ohio, has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The

case is before the Court on the petition and respondent's return of writ with exhibits, including

the transcript of the challenged state criminal trial proceeding. (Docs. 1, 8).

## I. PROCEDURAL HISTORY

### State Trial Proceedings

On September 5, 2008, the Hamilton County, Ohio, grand jury returned a twelve-count

indictment against petitioner stemming from an incident that occurred in March 2006, which

resulted in the death of two victims and physical injury to a third victim. Specifically, the

indictment charged petitioner with one count of aggravated murder in violation of Ohio Rev.

Code § 2903.01(B), as well as two counts of murder in violation of Ohio Rev. Code § 2903.02,

for his role in causing the death of victim Janie Mathews (Counts 1, 3, 5); one count of

aggravated murder in violation of Ohio Rev. Code § 2903.01(B), as well as two counts of murder

in violation of Ohio Rev. Code § 2903.02, for his role in causing the death of victim Rodney

Turnbow (Counts 2, 4, 6); two counts of felonious assault in violation of Ohio Rev. Code §

2903.11(A) stemming from the non-fatal shooting of a third victim, Deandre Thomas (Counts 7,

8); three counts of aggravated robbery in violation of Ohio Rev. Code § 2911.01(A) allegedly

committed against another victim, Derrick Dumas, who was present at the scene (Counts 9-11);

and one count of having weapons while under disability in violation of Ohio Rev. Code §

2923.13(A)(3) (Count 12). (Doc. 8, Ex. 1). Firearm specifications were attached to the

aggravated murder, murder, felonious assault and aggravated robbery counts. (*Id.*).

In its direct appeal decision, the Ohio Court of Appeals, First Appellate District, provided

the following summary of the facts that led to petitioner's indictment, as gleaned from testimony

presented at petitioner's jury trial:[1]

### I. The Robbery

In March 2006, Janie Mathews was in her apartment at 722 Wayne Avenue in
Cincinnati, Ohio, playing cards with Thompson, Rodney Turnbow, Jr., Derrick
Dumas, and others. Thompson had stopped in early, played cards, lost money,
and left.

Shortly after midnight, someone knocked on the apartment door, and when
Mathews opened the door, she saw two masked men with guns standing outside
her apartment. As she attempted to close the door, the gunmen shot through the
door and killed her.

The gunmen then entered the apartment, robbed the remaining occupants, and
killed Turnbow. As they fled down a stairwell, they joined Thompson, who had
been acting as a lookout. During their escape, they ran into Deandre Thomas and
one of the three gunmen shot Thomas, but his wounds were not fatal. The other
two gunmen trampled Thomas as he lay on the ground. Cincinnati police officers
responded to a report that shots had been fired and found Deandre Thomas lying
on the staircase leading to the second floor of the apartment building.

---

[1] 28 U.S.C. § 2254(e)(1) provides that "[i]n a proceeding instituted by an application for a writ of habeas
corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a
State court shall be presumed correct" unless petitioner rebuts the presumption by "clear and convincing evidence."
Because petitioner has neither cited nor presented clear and convincing evidence to rebut the Ohio Court of Appeals'
factual findings quoted herein, the state appellate court's factual findings are presumed to be correct. *See McAdoo v.
Elo,* 365 F.3d 487, 493-94 (6th Cir. 2004).

## II. The State's Witnesses

### Deandre Thomas's Testimony

Thomas testified that Thompson had shot him. Thomas also testified that he had known Thompson for many years and that it had been easy to identify Thompson as the shooter–even though he had been wearing a mask at the time– because of his distinct eyes and because of his debilitated hand that previously had been injured by a gunshot. Thomas also testified that he had seen Thompson's car in the vicinity before he entered the stairwell where he was shot, and that two days before he had seen Thompson carrying a similar weapon–a MAC-10 or MAC-11 type machine gun–to the one that had been used in the robbery and shooting.

### Quincy Jones's Testimony

In addition to Thomas's testimony about Thompson being the shooter and about Thompson having used a MAC-10, the state called Quincy Jones, who testified that Thompson had tried to sell him a MAC-11 type gun. Jones then asked Thompson whether this was the same gun that had been used in the killings, and Thompson replied, "No." Jones later learned that Thompson had tried to sell him the gun used in the killings, and when Jones confronted Thompson with this new information, Thompson responded that he was trying to get rid of the weapon. Jones then asked Thompson what had happened on the night of the murder, and he responded that after he had left the card game, he called some people to help commit the robbery. Jones also said that, though Thompson admitted that he had called people to orchestrate the robbery, Thompson never detailed his involvement in the shootings.

### Dontai Robinson's Testimony

Dontai Robinson testified that several days before the actual robbery took place, Thompson had discussed robbing Mathews's apartment with him. Robinson testified that Thompson had wanted to steal the cash that he believed would be at Mathews's apartment, and that they had cased the apartment, but that an opportune moment had never arisen because someone was always there to thwart their plan.

According to Robinson, Thompson became impatient and decided that he would go to the apartment and proceed with the robbery plan regardless of whether the apartment was occupied. Thompson's suggestion that they rob the apartment, whether it was occupied or not, did not sit well with Robinson, and he backed out of the robbery plan. Robinson made it clear that "if [the robbery] wasn't going to be [committed] with nobody there, [he] didn't want anything to do with it."

### Antuann Watkins's Testimony

Antuann Watkins testified that, on the night of the robbery, Thompson had called him and told him that he had "a lick" on Turnbow, meaning that they were going to rob Turnbow. Thompson picked up Watkins, Kenneth Kennedy, and Marcus Lovette and drove to Mathews's apartment, though he did not divulge the destination to any of them. On learning that the offense would involve his aunt, Watkins became resistant, but his concerns were allayed by Thompson's assurance that they would plan to ambush Turnbow only when he walked outside the apartment. So the foursome continued to Mathews's apartment.

Shortly after their arrival, Thompson reneged on the original plan to wait for Turnbow to walk outside, and he instead decided to commit the robbery inside the apartment while it was being occupied. In attempting to persuade Watkins to participate, Thompson said that it would be an easy "lick" because the apartment's occupants were unarmed. But Watkins withdrew from the plan and waited in the car while Thompson, Kennedy, and Lovette advanced toward the apartment to commit the robbery. A short time later, Watkins heard four or five gunshots and saw Thompson, Kennedy, and Lovette fleeing from the apartment.

As the trio got into the car, Watkins heard Kennedy say that he had shot everybody in the place, including the woman at the door. Watkins immediately became upset because he correctly assumed that the woman who had been shot was his aunt. Watkins and Kennedy then scuffled over control of a gun, and eventually Thompson took the weapon from both of them so that he could dispose of it.

### III. As Thompson Talks, His Story Evolves, and His Role Enlarges

Some three years after Mathews and Turnbow had been killed, police were still investigating the robbery and murders. From the beginning, Thompson was a suspect, and he was questioned shortly after the crimes were committed.

In Thompson's first interview, he stated that he had played cards at Mathews's house but had left before the robbery and did not return. Thompson stated that he had not committed the crimes and did not know who had killed Mathews and Turnbow, but that the robbery might have been staged by another participant who had been playing cards that night.

Later, Thompson was interviewed in the Queensgate Correctional Facility, where he was being held on other charges, and still later he was again questioned in Lancaster, Ohio, at the Southeastern Correctional Institute. In these later interviews, Thompson said that he had nothing to do with the robbery and murders, and that he had been at home asleep when the crimes were committed. Thompson also stated that he had received a phone call that night that woke him up and informed him of the murders.

After Thompson had been charged with the murders, he agreed to another

interview where he again stated that he had no information about the offenses. Apparently Thompson sensed that his story had not been well received, and he eventually admitted that he had been present during the killings but that Watkins had called him to set up the robbery. Thompson then attempted to minimize his role by stating that he had driven the car, pointed out the apartment, and acted as a lookout at the bottom of the stairs. He then maintained that, as soon as he had heard shots fired, he ran back out to the car, where Watkins was waiting.

The final version of Thompson's story came at trial when he testified that Watkins had driven the men to the apartment; that he had not known where they were going; that he had been forced at gunpoint to identify Mathews's door and to act as a lookout; and that the others had forced him to take $100 for his role as a lookout and for maintaining his silence.

(Doc. 8, Ex. 7, pp. 2-7).

After hearing all the evidence presented at trial, the jury found petitioner guilty as charged. (*See* Doc. 8, Ex. 2). On June 24, 2009, the trial court issued a Judgment Entry sentencing petitioner to the following consecutive terms of imprisonment: life prison terms, without the possibility of parole, for the two aggravated murder offenses charged in Counts 1 and 2; a three-year prison term for one of the firearm specifications attached to Count 1; an eight-year prison term for the felonious assault offense charged in Count 8; ten-year prison terms for the aggravated robbery offenses charged in Counts 9 and 11; and a five-year prison term for having weapons while under disability, as charged in Count 12.[2] (Doc. 8, Ex. 2).

### State Appeal Proceedings

With the assistance of new counsel for appeal purposes, petitioner timely appealed to the Ohio Court of Appeals, First Appellate District. (Doc. 8, Exs. 4-5). In the appellate brief, petitioner challenged the sufficiency and weight of the evidence supporting his convictions in

---

[2]It is further noted that for the purposes of sentencing, the trial court merged the murder charges in Counts 3, 4, 5 and 6 with the aggravated murder charges contained in Counts 1 and 2; the felonious assault charge in Count 7 with the felonious assault charge contained in Count 8; and the remaining firearm specifications with the three-year firearm specification attached to Count 1. (*See* Doc. 8, Ex. 2). In addition, as the trial court clarified in a "nunc pro tunc" amended Judgment Entry filed July 1, 2009, a concurrent ten-year prison term was imposed for the aggravated robbery offense charged in Count 10. (*See* Doc. 8, Exs. 2-3).

one assignment of error and asserted the following two additional assignments of error:

> 1. Improper vouching and misstatements of evidence in closing argument denied defendant a fair trial in violation of the 5th Amendment to the United States Constitution and Article 1, Section 16 of the Ohio Constitution.

> 2. Defendant was denied the effective assistance of counsel in violation of the 6th Amendment to the United States Constitution and Article 1, Section 10 of the Ohio Constitution [as a result of counsel's failure to object to the prosecutor's misconduct during closing argument].

(Doc. 8, Ex. 5). On May 28, 2010, the Ohio Court of Appeals overruled the three assignments of error and affirmed the trial court's judgment. (Doc. 8, Ex. 7).

Petitioner filed a timely *pro se* appeal to the Ohio Supreme Court, raising the same claims of error that he had presented on direct appeal together with additional allegations of ineffective assistance by his trial counsel. (*See* Doc. 8, Exs. 8-9). On September 29, 2010, the Ohio Supreme Court denied petitioner leave to appeal and summarily dismissed the appeal "as not involving any substantial constitutional question." (Doc. 8, Ex. 11).

## Federal Habeas Corpus

Petitioner filed the instant petition for federal habeas corpus relief in May 2011. (*See* Doc. 1). In the petition, he asserts the following claim as the sole ground for relief:

**Ground One:** Petitioner was denied the effective assistance of counsel in violation of the 6th and 14th Amendments to the United States Constitution, when counsel failed to object to prosecutorial misconduct.

(Doc. 1, p. 18).

In the return of writ filed in response to the petition, respondent contends that petitioner procedurally defaulted and has waived a portion of his claim based on allegations of ineffectiveness that were not raised on direct appeal to the Ohio Court of Appeals. (*See* Doc. 8, Brief, pp. 8-11). Respondent further argues that petitioner is not entitled to relief based on the merits of his remaining allegations of ineffective assistance by trial counsel because the Ohio

6

Court of Appeals' adjudication of those issues was neither contrary to nor an unreasonable application of clearly-established federal law as determined by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668 (1984). (*See* Doc. 8, Brief, pp. 14-21).

## II. OPINION

### Petitioner Is Not Entitled To Relief Based On The Merits Of His Claim Challenging His Counsel's Failure To Object To The Prosecutor's Remarks In Closing Argument

Petitioner alleges as the sole ground for relief that he was denied the effective assistance of counsel when his trial attorney failed to object to the prosecutor's improper remarks during closing argument. (Doc. 1, p. 18). Specifically, petitioner claims that, given the contradictory trial testimony of State witnesses Quincy Jones, Dontai Robinson and Antuann Watkins, his counsel should have objected to the prosecutor's misleading representation that "the motley assortment of convicted felons" called to testify as witnesses for the State "were all credible," "had no reason to lie," and "received nothing for their cooperation." (Doc. 1, pp. 18-19). In addition, petitioner contends that an objection should have been lodged when "[a]fter vouching for his own witnesses, and repeatedly denigrating defendant's credibility, the prosecutor went on to misrepresent the testimony of the investigating officers in a further attempt to discredit defendant's version of events." (Doc. 1, pp. 19-20).

As an initial matter, respondent argues that petitioner has waived a portion of his claim for relief to the extent he alleges that the prosecutor misstated the evidence in vouching for the credibility of State witness Dontai Robinson. (Doc. 8, Brief, pp. 10-11). Respondent contends that petitioner procedurally defaulted the particular issue because he failed to flag it in his brief on appeal to the Ohio Court of Appeals. (*Id.*). However, it appears upon review of the brief filed by petitioner's counsel on direct appeal that the issue was in fact presented to the Ohio Court of Appeals for its consideration. (*See* Doc. 8, Ex. 5, p. 8). Therefore, the matter was fairly

7

presented to the state courts, and petitioner's entire claim for federal habeas corpus relief is subject to review on the merits herein. *See* 28 U.S.C. § 2254(b)(1), (c); *see also Anderson v. Harless,* 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor,* 404 U.S. 270, 275-76 (1971).

At trial, Cincinnati police officers Tim Gormly and John Horn testified for the State regarding statements that petitioner made in various police interviews held over the years, beginning in April 2006 soon after the shooting incident occurred and ending with petitioner's post-arrest interview in September 2008. (*See* Doc. 8, Trial Tr. 428-42, 461-69). Petitioner's final statement on September 8, 2008 was recorded.[3] (Doc. 8, Trial Tr. 434-36). The digital recording of that statement was played at trial, and the jurors were also provided with a transcript to refer to as an "aid" while listening to the recording. (*See* Doc. 8, Trial Tr. 440-42).

In addition, four persons serving state prison terms were called as prosecution witnesses: Deandre Thomas, Quincy Jones, Dontai Robinson and Antuann Watkins. On direct examination, the prosecutor questioned each of these persons to establish they were credible witnesses who received no guarantees of preferential treatment or other benefit from the State in exchange for their testimony in this case. (*See* Doc. 8, Trial Tr. 193-95, 225-27, 376-77, 400-01). On cross-examination, defense counsel did not seek to undermine Thomas's representation that he had received no promises from the State and did not expect his fifteen-year sentence for felonious assault to be changed because of his testimony in this case. (*See* Doc. 8, Trial Tr. 193-95). Petitioner's counsel also did not pose any questions to Watkins regarding his testimony on direct examination confirming that the prosecutor promised to "speak for [him] if there was

---

[3]Gormly and Horn testified at trial that the recording was made after petitioner had been in their custody for eight hours. (Doc. 8, Trial Tr. 446, 468). Petitioner was subjected to questioning during that eight-hour period, in which there was "a lot of dead time" to allow for "breaks" for petitioner and for time to investigate information that petitioner provided to the officers. (Doc. 8, Trial Tr. 446, 453). Officer Horn explained on cross-examination that no recording was made of statements taken during the eight-hour time-frame that preceded petitioner's recorded statement because the earlier statements were made before petitioner provided his "final version" of events. (Doc. 8, Trial Tr. 468-69).

some motion for mitigation or early release" from the three-year prison sentence that he was serving at the time, but that he had "no idea" whether he would actually receive a reduction in sentence or early release because it was up to the judge in his case to make that decision. (Doc. 8, Trial Tr. 400-01). However, counsel did cross-examine Quincy Jones and Dontai Robinson in an effort to undermine their credibility by showing that they testified for the State in order to receive preferential treatment in their criminal cases or because they had another personal motive to testify against petitioner. (*See* Doc. 8, Trial Tr. 236-46, 384-86).

On direct appeal, petitioner asserted as the first assignment of error that the prosecutor engaged in misconduct during closing argument by (A) offering his personal opinion about the credibility of witnesses, and (B) misstating or misrepresenting the evidence that was presented at trial. (See Doc. 8, Ex. 5, pp. 4, 6). Specifically, petitioner cited the following remarks by the prosecutor as both improperly vouching for and misrepresenting the credibility of the "motley assortment of convicted felons" who testified for the State:

> None of them got any breaks. They had no reason to come in here and lie about anything. The last one, Antuann Watkins, hopes to get some consideration. He was not made any promises.
>
> But the other five or six had nothing. . . . They were all credible.

(*See* Doc. 8, Ex. 5, p. 7 & Trial Tr. 590-91).[4] Petitioner also challenged the following comment by the prosecutor as misrepresenting the investigating police officers' testimony regarding petitioner's account of the shooting incident as it evolved over the course of their investigation from April 2006 to September 2008:

---

[4]In the brief filed on direct appeal, petitioner's counsel cited other comments by the prosecutor in closing argument as support for the argument under sub-heading "(A)" that the prosecutor improperly "offered personal opinions on the credibility of witnesses." (Doc. 8, Ex. 5, pp. 4-6). However, it appears that petitioner has abandoned any argument based on those additional comments by failing to cite them on further appeal to the Ohio Supreme Court and by setting forth as "supporting facts" for his federal habeas corpus claim only those allegations and arguments that were raised on direct appeal under the separate sub-heading "(B)." (*See* Doc. 1, pp. 18-21; Doc. 8, Ex. 5, pp. 6-9 & Ex. 9, pp. 3-6).

> Then we have the defendant's statements and testimony. His first statement, and defense counsel kept asking him when he was testifying, didn't you tell him–you told him about Marcus [Marcus Lovette] and Midnight [Kenneth Kennedy] every time, didn't you?
>
> Well, he didn't. Marcus and Midnight's name didn't come up until the fifth statement. That's when those names came up, the fifth statement.

(Doc. 8, Ex. 5, p. 8 & Trial Tr. 601). Because defense counsel did not object to any of these remarks, petitioner further asserted as a separate claim for relief that counsel was ineffective for failing to "interpose objections which might have barred [the] damaging comment[s], and corrected [the] factual misstatement[s] of the evidence." (Doc. 8, Ex. 5, p. 10).

The Ohio Court of Appeals, which was the only state court to address the merits of these claims, first addressed petitioner's allegations of prosecutorial misconduct; the court overruled the assignment of error, reasoning in relevant part as follows:

> A prosecutor may not express a personal belief or opinion on the credibility of a witness. Prosecutors are afforded a degree of latitude in their concluding remarks, and they are free to draw reasonable inferences from the evidence at trial and may comment on those inferences during closing arguments. We note in this case that the state was not vouching for its witnesses; it was merely commenting on which witnesses would have a motive to lie, while pointing out facts that were in evidence that made each witness more or less credible as compared with Thompson's testimony and version of the facts. The evidence shows that Thompson had attempted to attack the veracity of the state's witnesses by arguing that they were all criminals who had made deals with the state, and that they could not be believed. In rebutting Thompson's attack on the credibility of its witnesses, the state did not improperly vouch for its witnesses; it merely commented on the evidence. The record does not support Thompson's claim of improper personal vouching or any implication that such conduct occurred. We hold that the prosecutor's statements were not improper–the closing remarks did not amount to improper vouching, nor did they give any impression that the state had personal knowledge about the motivations of witnesses.
>
> In the same vein, Thompson also argues that the state misstated facts about agreements it had reached with its witnesses and about Thompson's statements to the police. . . . Thompson's appellate brief argues that both Quincy Jones and Antuann Watkins had received consideration in exchange for their testimony, and that the prosecution's closing arguments contradicted, misstated, or misrepresented that fact.

Jones testified that as part of his plea bargain he would testify in other cases. But Jones never agreed to testify in this particular case; his agreement was a general one to testify in multiple cases where he had knowledge of the facts. When brokering his plea bargain, Jones never spoke to the prosecutor in this case, and he testified that he had made a specific deal to testify in another case in exchange for less time served, but that he had not made a similar deal with the prosecutor in this case.

We note that in a technical sense Jones was not given a deal to testify in this case; rather the arrangement that Jones negotiated was that he would testify in future cases, and the record shows that the arrangement did not contemplate that he would testify in Thompson's specific case. But Jones did confirm that after he had testified before the grand jury in this case, his two murder charges were reduced to manslaughter, and that he had received a four-year sentence for manslaughter, but that the lesser charges and sentence had occurred only after he had "clarified some stuff on [his] case." The prosecutor's statement that Jones did not get a break was close to being misleading, but we are convinced that any perceived misstatement was cured by the full disclosure to the jury of the circumstances surrounding Jones's testimony and by the fact that the prosecutor in this case was never involved in Jones's plea bargain. Thompson's argument is largely a matter of perception, and the jury had the relevant information that it required to make an assessment of Jones's credibility. We cannot say that the prosecution misrepresented the fact that it had not bargained with Jones in this case.

The record also shows that Antuann Watkins testified that, in exchange for his testimony, the prosecutor had agreed to speak on his behalf with regard to a pending motion for his early release for an unrelated crime. But the record is clear that Watkins was promised only that the prosecutor would appear on his behalf, which was not a guarantee for a favorable outcome. We note that the prosecutor pointed out that fact to the jury, and we are convinced that in neither Jones's nor Watkins's case did the prosecutor's arguments run afoul of the law.

Finally Thompson argues that the prosecution improperly argued that he had changed his story throughout the investigation. This aspect of the assignment of error is summarily overruled. The evidence shows that Thompson had originally stated that he did not know who had killed Mathews and Turnbow and that he did not know anything about the crimes. Later Thompson told police that Watkins, Kennedy, and Lovette were involved in the crime–all the while continuing to deny his own participation. Eventually Thompson admitted that he had acted as a lookout. And finally at trial, Thompson stated that he had been forced to participate in the crime at gunpoint. That Thompson's story changed throughout the investigation is palpably factual and well documented in the record, and Thompson's argument to the contrary is overruled.

We hold that the prosecutor's statements were not improper, but nevertheless we note that Thompson did not object to any of the comments that he now

11

challenges; therefore, even if we were to assume that there had been an improper statement by the prosecution, we hold that it was not outcome-determinative and therefore did not constitute plain error.

(Doc. 8, Ex. 7, pp. 8-11) (footnote citations omitted).

The Ohio Court of Appeals next addressed petitioner's ineffective-assistance-of-counsel claim. Noting that petitioner was required to demonstrate under *Strickland v. Washington*, 466 U.S. 668 (1984), that his "counsel's performance was deficient" and that "the deficiency prejudiced the defendant," the court summarily overruled the assignment of error as follows:

As we have already noted, the state's representations regarding its witnesses were not improper, and they did not warrant an objection from defense counsel. It, therefore, cannot be said that counsel's performance was deficient.

(Doc. 8, Ex. 7, p. 11).

In this federal habeas case, the applicable standard of review governing the adjudication of the constitutional issues that were addressed on the merits by the Ohio Court of Appeals is set forth in 28 U.S.C. § 2254(d). Under that provision, a writ of habeas corpus may not issue with respect to any claim adjudicated on the merits by the state courts unless the adjudication either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

"A decision is 'contrary to' clearly established federal law when 'the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Otte v. Houk,* 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000)), *cert. denied,* __ S.Ct. __, 2012 WL 896009 (U.S. Mar. 19,

2012) (No. 11-7970). "A state court's adjudication only results in an 'unreasonable application' of clearly established federal law when 'the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* at 599-600 (quoting *Williams,* 529 U.S. at 413).

The statutory standard, established when the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) was enacted, is a difficult one for habeas petitioners to meet. *Id.* at 600. As the Sixth Circuit recently explained in *Otte*:

> Indeed, the Supreme Court has been increasingly vigorous in enforcing AEDPA's standards. *See, e.g., Cullen v. Pinholster,* __ U.S. __, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011) (holding that AEDPA limits a federal habeas court to the record before the state court where a claim has been adjudicated on the merits by the state court). It is not enough for us to determine that the state court's determination is *incorrect*; to grant the writ under this clause, we must hold that the state court's determination is *unreasonable*. . . . This is a "substantially higher threshold.". . . To warrant AEDPA deference, a state court's "decision on the merits" does not have to give any explanation for its results, *Harrington v. Richter,* __ U.S. __, 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011), nor does it need to cite the relevant Supreme Court cases, as long as "neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam).

*Id.* (emphasis in original).

Although the standard is difficult to meet, § 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington*, 131 S.Ct. at 786. In other words, to obtain federal habeas relief under that provision, the state prisoner must show that the state court ruling on the claim presented "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

13

The Supreme Court has clarified that in assessing the merits of a constitutional claim under § 2254(d), the federal habeas court must apply the Supreme Court precedents that controlled at the time of the last state-court adjudication on the merits, as opposed to when the conviction became "final." *Greene v. Fisher*, __ U.S. __, 132 S.Ct. 38, 44-45 (2011); *cf. Otte*, 654 F.3d at 600 (citing *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)) (in evaluating the merits of a claim addressed by the state courts, the federal habeas court must "look to Supreme Court cases already decided at the time the state court made its decision"). In *Greene*, 132 U.S. at 44, the Court explained:

> [W]e held last term in *Cullen v. Pinholster*, 563 U.S. __, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011), that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the prisoner's claim on the merits. We said that the provision's "backward-looking language requires an examination of the state-court decision at the time it was made." *Id.*, at __, 131 S.Ct. at 1398. The reasoning of *Cullen* determines the result here. As we explained, § 2254(d)(1) requires federal courts to "focu[s] on what a state court knew and did," and to measure state-court decisions *as of 'the time the state court renders its decision.'" Id.*, at __, 131 S.Ct. at 1399 (quoting *Lockyer v. Andrade*, 538 U.S. [at] 71-72 . . .; emphasis added).

Decisions by lower courts are relevant "to the extent [they] already reviewed and interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court." *Otte*, 654 F.3d at 600 (quoting *Landrum v. Mitchell*, 625 F.3d 905, 914 (6th Cir. 2010), *cert. denied*, 132 S.Ct. 127 (2011)). The writ may issue only if the application of clearly-established federal law is objectively unreasonable "in light of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision." *McGhee v. Yukins*, 229 F.3d 506, 510 (6th Cir. 2000) (citing *Williams*, 529 U.S. at 412).

In this case, the Ohio Court of Appeals correctly identified the two-prong standard of review enunciated by the Supreme Court in *Strickland* as governing the resolution of petitioner's

ineffective-assistance-of-counsel claim. (*See* Doc. 8, Ex. 7, p. 11 & n.8). As the state appellate court recognized, to establish a *Strickland* violation, petitioner must demonstrate both (1) his trial attorney's conduct was constitutionally deficient; and (2) counsel's deficient performance prejudiced the defense. *See Strickland*, 466 U.S. at 687.

Under the first prong of the *Strickland* test, it must be shown that counsel's representation fell below an objective standard of reasonableness based on all the circumstances surrounding the case. *Id.* at 688. In determining whether or not counsel's performance was deficient, the Court must indulge a strong presumption that the challenged conduct fell within the wide range of reasonable professional assistance. *Id.* at 689. To satisfy the second "prejudice" prong of the *Strickland* test, petitioner must demonstrate that a "reasonable probability" exists that, but for his counsel's errors, the outcome of the trial would have been different. *See Strickland,* 466 U.S. at 694. Petitioner has met his burden if he shows that the result of the trial would "reasonably likely have been different absent the errors." *Id.* at 695. The Court need not examine the question of whether counsel's performance was deficient before addressing the question of whether petitioner was prejudiced by the challenged conduct. The Court may dispose of an ineffective assistance of counsel claim by finding that petitioner has made an insufficient showing on either ground. *Id.* at 697.

Here, the Ohio Court of Appeals concluded that defense counsel's failure to object to the prosecutor's challenged closing remarks did not constitute ineffective assistance under the first prong of the *Strickland* test. Although the undersigned finds that some of the prosecutor's challenged comments may have exceeded the bounds of propriety, the state appellate court's adjudication of petitioner's ineffective-assistance-of-counsel claim was neither contrary to nor involved an unreasonable application of *Strickland*.

First, as the Ohio Court of Appeals reasonably found, the prosecutor did not misrepresent

15

the police officers' testimony to the extent that he argued that "petitioner changed his story" in

police interviews held "throughout the investigation." (*See* Doc. 8, Ex. 7, p. 10). Indeed,

petitioner does not dispute the state court's factual findings that over the course of the years of

the police investigation, petitioner changed his account of the events by first denying any

knowledge about the crimes; then later telling the police that Watkins, Kennedy and Lovette

were involved, while continuing to deny his own participation; and finally admitting in his post-

arrest interview on September 8, 2008 that he had acted as a lookout.[5] (*See id.* & Trial Tr. 428-

42, 461-69). Petitioner contends only that contrary to the prosecutor's statements in closing

argument, he actually identified Kennedy and Lovette as "the shooters" as early as his second

police interview and first meeting with Officer Horn on September 1, 2006 at the Queensgate

correctional facility. (*See* Doc. 1, p. 20; *see also* Doc. 8, Trial Tr. 462, 465).[6]

As petitioner has claimed, the prosecutor misstated the evidence to the extent he

represented that petitioner first mentioned Kennedy's and Lovette's names in his "fifth

statement" to the police. However, although no objection was lodged when the remarks were

made, petitioner's trial attorneys made the following statements in closing argument to

emphasize to the jury that the prosecutor had misstated the evidence and that petitioner in fact

had told Officer Horn at their first meeting in September 2006 that he believed Kennedy and

Lovette participated in the shootings:

> The one thing even Detective Horn will tell you and actually he testified to, every
> time he talked to Mr. Thompson, he said Midnight and Marcus, every time. You

---

[5]In any event, as noted earlier, *see supra* p. 2 n.1, the state court's factual findings are presumed correct
under 28 U.S.C. § 2254(e)(1) in the absence of clear and convincing evidence to the contrary.

[6]Petitioner has further claimed that at that time he even expressed a willingness to help the police obtain
evidence against Kennedy and Lovette. In support of this contention, he states that Officer Horn confirmed at trial
that petitioner "offered to wear a wire and talk to Marcus and Midnight about the shooting." (Doc. 1, p. 20).
However, the record belies that contention. Rather, when defense counsel asked Horn on cross-examination whether
petitioner had made such an offer, the prosecutor immediately lodged an objection, which was sustained. (Doc. 8,
Trial Tr. 466-67).

don't have to believe me. Remember from his testimony.

****

The interviews with Jaydee, he came in voluntarily, talked to the police, called
them the day after it happened, gave them the names every single time, contrary
to what you've been told. That's a fact. Detective Horn testified to it. Every
time he talked to him, he told him the names. He verified 90 percent of
everything he said.

****

The prosecutor tells you that Marcus and Midnight were never mentioned, and
Officer Horn told you they've mentioned him all along. He was very interested in
having him go after Marcus and Midnight.

(Doc. 8, Trial Tr. 612, 623, 646).

Counsel's decision to address the matter in closing argument, rather than by objection
with the accompanying risk of an adverse ruling by the trial court, was a matter of trial strategy
falling within the wide range of reasonable professional assistance. *Cf. Walker v. Morrow*, __ F.
App'x __, No. 09-6537, 2012 WL 313689, at *11 (6th Cir. Feb. 1, 2012) (citing *Hodge v. Hurley*,
426 F.3d 368, 385-86 (6th Cir. 2005)) ("A petitioner's ineffective assistance claim based on
counsel's failure to object will not succeed if the decision not to object flowed from objectively
reasonable trial strategy."). Therefore, as the state appellate court concluded, petitioner has not
demonstrated that his trial counsel's performance was deficient under the first prong of the
*Strickland* test. In any event, given counsel's rebuttal argument specifically addressing the
prosecutor's misrepresentation of the police officers' testimony, as well as the undisputed
evidence regarding petitioner's changing testimony throughout the investigation and at the trial
itself, it is not reasonably likely under the second "prejudice" prong of the *Strickland* test that the
trial's outcome would have been different if counsel had immediately objected to the challenged
remarks. *See Strickland*, 466 U.S. at 695.

With respect to petitioner's second claim of error by counsel, petitioner contends that his

17

trial attorney should have objected to the prosecutor's comments about the state prisoners who testified for the State because the remarks both improperly vouched for and misrepresented the credibility of those witnesses. The Ohio Court of Appeals ruled that the prosecutor neither improperly vouched for the credibility of the witnesses nor misrepresented the evidence by stating that they did not receive "any breaks," "had no reason to come in here and lie," and "were not made any promise" in exchange for their testimony. (Doc. 8, Ex. 7, pp. 8-11). Because the court found the prosecutor's "representations regarding its witnesses were not improper," the court held that defense counsel's conduct was not deficient under the first prong of the *Strickland* test. (Doc. 8, Ex. 7, p. 11).

Upon review of the record, the undersigned concludes that the state appellate court's ruling was neither contrary to nor involved an unreasonable application of *Strickland* to the extent that the court held no objection was warranted because the prosecutor had not "run afoul of the law" in his representation of the facts regarding the witnesses' credibility. (*See* Doc. 8, Ex. 7, pp. 9-10).

The representations were made to counter the defense's attempts to cast doubt on the credibility of the inmate witnesses to the extent they may have been promised or hoped to obtain an earlier release from prison in exchange for their testimony. As discussed above, Deandre Thomas testified that he received no promises and did not expect to obtain a reduction in his prison sentence because of his testimony in this case. (Doc. 8, Trial Tr. 193-95). Moreover, Dontai Robinson testified on cross-examination that he received "[n]othing" in exchange for his testimony. (Doc. 8, Trial Tr. 384). No evidence was presented to refute that testimony.

Nevertheless, petitioner contends that the prosecutor misrepresented the evidence regarding Robinson's credibility given Robinson's testimony at trial that he decided to provide information to the police because the residence of a mutual friend, the mother of one of his

18

children and several of petitioner's children,[7] was "shot up because of this case because [petitioner] was also living there at the time." (*See* Doc. 8, Trial Tr. 385-86). However, the prosecutor was not required to address every conceivable argument that could be asserted by the defense to attack the credibility of the State witnesses in his closing remarks. Rather, the prosecutor's challenged statements were aimed only at addressing credibility concerns arising from the witnesses' status as prisoners with criminal records in the custody of the State. Given the focus and context of the prosecutor's argument, which included a specific reference to the fact that Thomas was not given "any breaks" from his fifteen-year sentence (*see* Doc. 8, Trial Tr. 591), the prosecutor's general passing comment that the witnesses "had no reason to lie" did not constitute a misrepresentation of the evidence about Robinson. It was, therefore, reasonable for petitioner's counsel to construe the comment as falling within the acceptable degree of latitude allowed for closing arguments.[8] Indeed, defense counsel effectively represented petitioner in attacking Robinson's credibility by expressly pointing out in closing argument that Robinson had a motive to testify against petitioner because he "obviously has a little bit of controversy and animosity possibly towards Jaydee. They love the same woman." (*See* Doc. 8, Trial Tr. 613).

The issue whether the prosecutor misrepresented the facts pertaining to Quincy Jones and Antuann Watkins presents a closer question, which the Ohio Court of Appeals apparently understood in addressing the matter at length in the direct appeal decision. (*See* Doc. 8, Ex. 7, pp. 9-10). Jones testified that he received a reduction in charges and a four-year minimum

---

[7]Robinson later testified on cross-examination that he was not the biological father of his child because the woman was already pregnant when they met. (Doc. 8, Trial Tr. 392).

[8]It is noted that petitioner has also cited Jones's testimony on cross-examination that his friendship with petitioner cooled in 2005 after petitioner tried to place the "blame" on Jones for a fake drug deal when they both knowingly "sold a guy some drugs that wasn't [sic] real." (Doc. 8, Trial Tr. 240). However, for the same reason that Dontai Robinson's testimony does not trigger concerns about the effectiveness of petitioner's trial counsel, petitioner is unable to prevail on any claim that his counsel should have objected to the prosecutor's challenged remarks as misrepresenting evidence in light of Jones's arguable personal motive for testifying against him.

sentence for manslaughter as "consideration" for his testimony in "other cases" and "probably" this case. (Doc. 8, Trial Tr. 225-27, 236-37). In addition, Watkins confirmed on direct examination that the prosecutor promised to "speak for [him] if there was some motion for mitigation or early release" from the three-year prison sentence that he was serving at the time. (Doc. 8, Trial Tr. 400-01). However, Watkins stated that no other promises were made and that he had "no idea" whether he would actually receive a reduction in sentence or early release because it was up to the judge in his case to make that decision. (Doc. 8, Trial Tr. 401). Moreover, Jones unequivocally averred that he never spoke to the prosecutor or police officers involved in the instant criminal case about the possibility of receiving a reduced sentence in exchange for his testimony and that, unlike other cases he participated in, no such agreement was made in this case. (Doc. 8, Trial Tr. 226-27, 245-46).

The record supports the Ohio Court of Appeals' finding that "Watkins was promised only that the prosecutor would appear on his behalf, which was not a guarantee for a favorable outcome" in his case. (Doc. 8, Ex. 7, p. 10). Therefore, it was reasonable for the state court to conclude that the prosecutor's comment that "Antuann Watkins hopes to get some consideration," but "was not made any promises," did not rise to the level of a misstatement or misrepresentation of the evidence. (*See* Doc. 8, Trial Tr. 590). In any event, the remark was not so misleading that petitioner's counsel acted unreasonably by failing to immediately object to it and instead waiting until closing argument to attack the State's interpretation of the evidence by arguing in pertinent part as follows:

> Let's talk about Antuann. When he came in to testify, they said he was given consideration for his testimony. I know the prosecution makes it sound like, well, he's just you know, no promise, but you need to understand what does consideration mean to someone who is sitting in prison looking at a long sentence?
>
> What would it mean to you to have a prosecutor come and speak on your behalf at

20

a parole hearing? It's not small. Would that consideration make it worth him to skew his story? . . . .

When you're looking at the testimony of these people, okay, yes, a lot of them are in jail, a lot of them have felony records, put your criminal hat on, look in their eyes, does it make sense?

(Doc. 8, Trial Tr. 613-14). Petitioner has not shown that his counsel's decision to address the matter during closing argument rather than by objection fell outside the wide range of reasonable professional assistance or prejudiced the defense. Therefore, as the Ohio Court of Appeals reasonably concluded, petitioner has not demonstrated that his counsel was ineffective under *Strickland* in challenging the prosecutor's remarks as they pertained to Watkins.

The record also supports the Ohio Court of Appeals' findings and conclusion that the prosecutor did not misrepresent the fact that the prosecution had not bargained with or made any promises to Quincy Jones in exchange for his testimony in petitioner's case. (*See* Doc. 8, Ex. 7, p. 10). In ruling on the issue, the Ohio Court of Appeals did find that the prosecutor's comment that none of the inmate witnesses had received any breaks "was close to being misleading" with respect to Jones. (Doc. 8, Ex. 7, p. 9). It appears the court's concern was based on a question posed by defense counsel to Jones on cross-examination suggesting that Jones had received the minimum sentence of four years on the reduced charge of manslaughter after testifying for the grand jury in this case. (*See* Doc. 8, Ex. 7, p. 9 & Trial Tr. 236-37). However, as the court also noted, Jones's sole response to counsel's inquiry was: "I got the sentence after I clarified some stuff on my case already." (*See* Doc. 8, Ex. 7, p. 9 & Trial Tr. 237). The state court found that the "full disclosure to the jury of the circumstances surrounding Jones's testimony" and "the fact that the prosecutor in this case was never involved in Jones's plea bargain" cured "any perceived misstatement" stemming from that one remark. (Doc. 8, Ex. 7, pp. 9-10).

The undersigned agrees with the Ohio Court of Appeals' determination that "any

21

perceived misstatement" arising from the prosecutor's general remark that "none of [the witnesses] got any breaks" did not prejudicially impact the jury's assessment of Jones's credibility, particularly given that both of the attorneys who spoke on petitioner's behalf during the defense closing argument vociferously and specifically argued that Jones was not a credible witness because he had in fact received a significant benefit from the State for testifying in this case. Counsel stated:

> It doesn't make sense, the believability of Quincy Jones' story.

> He had consideration. He sat up there and told you. He was up for – he got huge consideration. Would that make a difference in what he testified to? He was up for two murder charges and got reduced down to one manslaughter which is four to eleven years and he got the minimum. Would that change your testimony?

> Would that put – in the mind of a criminal – a good reason to move your testimony, make up a story? You need to decide if that would be enough; not in the way you think. In the way they think, they're in prison. They're looking at life. They get four years. Is that enough consideration to lie?

****

> One of the ones that I felt was particularly egregious was Quincy Jones. He's got two charges of murder pending against him. He pleads to a manslaughter and gets a minimum sentence. Then when he comes in here and testifies, "Has anybody made any offers to you in exchange for this testimony?" "I had other cases already, but it all played in, whatever." "What do you mean?" "Well, like my time came, I had time. I got four years' time consideration for already for – there was a bunch of stuff." "Did you get any consideration for this case?" "Yes, I probably did."

(Doc. 8, Trial Tr. 620-21, 642-43).

In any event, even assuming error on the prosecutor's part in reference to Jones, because Jones consistently averred that the prosecutor in this case did not offer or enter into any agreement with him in exchange for his testimony, it was reasonable for petitioner's trial counsel to construe the prosecutor's general remark about the prisoner witnesses not receiving "any breaks" as falling within the acceptable bounds of closing argument. Therefore, it was

22

reasonable for counsel to instead devote closing argument to the rebuttal of the prosecutor's arguments by specific reference to the evidence undermining the prosecutor's interpretation of the facts regarding the credibility of each witness, including Jones. In so doing, counsel neither acted unreasonably nor prejudicially affected the outcome of the trial. Therefore, as the state appellate court reasonably concluded, petitioner has not demonstrated that counsel's failure to object to the prosecutor's remarks as misrepresentations or misstatements of the evidence amounted to ineffective assistance under *Strickland*.

Petitioner's final contention that the prosecutor improperly vouched for the credibility of the State witnesses poses the closest question given the prosecutor's concluding remark attesting to the fact that the witnesses "were all credible." (*See* Doc. 8, Trial Tr. 591). As the Ohio Court of Appeals acknowledged in its direct appeal decision (*see* Doc. 8, Ex. 7, p. 8), a prosecutor exceeds the bounds of propriety by expressing a personal belief in the credibility of a witness. *See, e.g., United States v. Gross,* 432 F. App'x 490, 494-95 (6th Cir.) (quoting *United States v. Francis,* 170 F.3d 546, 549 (6th Cir. 1999)), *cert. denied,* 132 S.Ct. 858 (2011); *Hodge,* 426 F.3d at 378; *see also United States v. Robinson,* 485 U.S. 25, 33 n.5 (1988) (citing *United States v. Young,* 470 U.S. 1 (1985); *Darden v. Wainwright,* 477 U.S. 187 (1986)). The Supreme Court has explained such conduct is improper because (1) the "comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges," thereby jeopardizing "the defendant's right to be tried solely on the basis of the evidence;" and (2) "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Hodge,* 426 F.3d at 378 (quoting *Young,* 470 U.S. at 18-19).

On the other hand, as the state appellate court also recognized in this case (*see* Doc. 8, Ex. 7, p. 8), it is permissible for a prosecutor to "attempt to explain why, based on the facts, [a]

23

witness's testimony is honest after the same has been attacked by the defense." *Gross*, 432 F. App'x at 495 (quoting *United States v. Henry*, 545 F.3d 367, 379 (6th Cir. 2008)). In *Gross*, the Sixth Circuit pointed out that because the "line between proper and improper discussion of witness credibility is fine at best," prosecutors who choose to make such remarks risk a finding of prejudicial error which may warrant the reversal of any resulting conviction. *See id.* (citing *Hodge*, wherein the Sixth Circuit granted habeas relief to a state prisoner who claimed that his trial counsel was ineffective for failing to object to the prosecutor's numerous remarks in closing argument improperly commenting on the credibility of witnesses and misrepresenting the evidence).

It is well-settled that a prosecutor's statement that certain witnesses "were credible" or gave "credible testimony" amounts to an improper expression of personal belief even when the comment is made in the course of discussing the evidence. *Id.* (citing *Henry*, 545 F.3d at 380); *cf. United States v. Bess*, 593 F.2d 749, 755-56 (6th Cir. 1979) (and cases cited therein). *See also Hodge*, 426 F.3d at 378 (disagreeing with the state appellate court's determination that the prosecutor's remarks that a certain witness was "absolutely believable" did not amount to misconduct which should have been objected to by defense counsel). Here, it appears upon review of the record that the prosecutor made a few remarks during closing argument generally attesting to the credibility or believability of the inmate witnesses' testimony in the course of discussing the evidence, which triggers concern that the prosecutor may have exceeded the bounds of propriety. (*See* Doc. 8, Trial Tr. 591, 592, 593, 604). Therefore, the undersigned will assume in petitioner's favor that (1) the prosecutor improperly vouched for the credibility of the state prisoner witnesses when he concluded his argument about the lack of breaks or promises offered the witnesses by stating that the witnesses "were all credible;" and (2) defense counsel performed deficiently under the first prong of the *Strickland* test by failing to object to the

24

comment as an improper expression of personal belief, particularly given that other similar comments were made by the prosecutor in closing argument. *Cf. Hodge*, 426 F.3d at 386 (holding in a habeas case that "the performance prong of the *Strickland* ineffectiveness test" was met because defense counsel's failure to object to the prosecutor's "pattern of repeated misconduct" in closing argument, which included numerous improper comments regarding the credibility of witnesses, was "outside the wide range of professionally competent assistance").

The inquiry does not end here, however. Counsel's deficient conduct does not amount to ineffective assistance under *Strickland* unless it prejudiced the defense by undermining the reliability of the trial result. *See Strickland*, 466 U.S. at 695. In this case, the undersigned concludes that petitioner has not satisfied the prejudice prong of the *Strickland* test because it is not reasonably likely that the outcome of the trial would have been different if defense counsel had objected to the prosecutor's expressions of personal belief.

In *Hodge*, which involved a child-rape conviction, the Sixth Circuit held that the petitioner "was prejudiced by his counsel's myriad failures to object to the prosecutor's misconduct." *Hodge*, 426 F.3d at 386. In so holding, the court reasoned that given the "lack of physical evidence confirming [that] sexual activity" had taken place, "the result depended primarily on the jury's determination" as to whether the petitioner, who testified in his own defense, or the complaining State witness were telling the truth. *See id.* at 386-87. The instant case is distinguishable from *Hodge*. First, the prosecutor's misconduct in *Hodge* was far more egregious and pervasive, involving not only the prosecutor's statements of personal belief regarding the veracity of the "two key witnesses in the case," but also several deliberate and "blatant misrepresentations" of the evidence, accusations of lying or "twisting [of] the facts" lodged against defense counsel and the defense expert witness, and numerous derogatory comments about the petitioner's "bad character." *See id.* at 377-85; *cf. Ross v. Pineda,* No.

25

3:10cv391, 2011 WL 1337102, at *11-12 (S.D. Ohio Apr. 7, 2011) (distinguishing *Hodge*); *Scheck v. Wilson*, No. 1:06cv1761, 2009 WL 2486051, at *16-17 (N.D. Ohio Aug. 11, 2009) (distinguishing *Hodge*).[9]

Second, in contrast to *Hodge* which presented a close case on the evidence, it is unlikely that the prosecutor's remarks attesting to the credibility of the inmate witnesses had a prejudicial impact on the jury's verdict because there was evidence in the record that the jury could independently consider in assessing the credibility of the witnesses' testimony and which established petitioner's guilt on the criminal charges. Specifically, each of the inmate witnesses separately and independently provided corroborative testimony to the extent that petitioner was uniformly and consistently identified as a knowing participant in the shootings and robbery, if not the planner, organizer and leader of the criminal enterprise. (*See* Doc. 8, Trial Tr. 204-06, 230-36, 378-84, 402-13). Indeed, Deandre Thomas, who was not given any deal in exchange for his testimony, identified petitioner as the person who shot him; although the men were wearing masks, Thomas said he could easily recognize petitioner, whom he has known for several years, because of his distinctive eyes and injured hand. (Doc. 8, Trial Tr. 194-95, 204-06). Perhaps most damning, however, was petitioner's own evolving testimony over the years beginning with his initial police interview in April 2006, where he denied knowledge about the crime other than that Derrick Dumas may have "set him up to make it look like he did it." (*See* Doc. 8, Trial Tr. 432-33). In his final recorded statement to the police after his arrest in September 2008, petitioner finally admitted that he was present at and involved with the shootings to the extent

---

[9]*See also Ratajczak v. Romanowski,* No. 2:08cv10102, 2010 WL 2232340, at *16 (E.D. Mich. June 2, 2010) (distinguishing the state prosecutor's statements referring to the habeas petitioner as a "liar," which were "too frequent to be characterized as isolated," from the prosecutor's comments in *Hodge* because, "read in context," the prosecutor's argument "did not appeal to the jury to accept the State's characterization of the Petitioner's credibility," but instead "asked the jury to conclude, based upon the evidence presented, that Petitioner's testimony was not credible").

that he stated that in response to a phone call from Antuann Watkins, he traveled with Watkins, Kennedy and Lovette to Mathews' apartment, showed Kennedy and Lovette where Mathews' lived, acted as a "lookout" while they committed the crimes, and disposed of the guns used in the shootings by taking them to his girlfriend's apartment. (*See* Doc. 8, Trial Tr. 435-40). Ultimately, at his trial in May 2009, petitioner claimed for the first time that he was forced at gunpoint to participate in the crimes. (*See* Doc. 8, Trial Tr. 499-503). *Cf. Mays v. Chandler*, 342 F. App'x 159, 168-70 (6th Cir. 2009) (in finding no prejudice resulted from defense counsel's deficient performance in failing to object to a police officer's inadmissible testimony that petitioner "wasn't being truthful" with him, the Sixth Circuit distinguished *Hodge* by pointing out that the petitioner had given trial testimony which "conflicted with his own earlier statement to police").

Finally, as discussed above, defense counsel devoted closing argument to pointing out the weaknesses in the prosecutor's arguments relating to the credibility of each of the State inmate witnesses' testimony, as well as positing arguments supporting the defense position. Moreover, before the jury retired to deliberate at the close of the case, the trial court instructed the jurors that they were the "sole triers of the facts, the credibility of the witnesses and the weight of the evidence," and that the evidence they could consider in deciding those issues did not include the closing arguments of counsel, which were designed only to assist them in their deliberations. (Doc. 8, Trial Tr. 675-76). The court went on to discuss at length the factors that the jury could consider, including the witnesses' criminal records, in deciding the credibility of each witness's testimony. (*See* Doc. 8, Trial Tr. 676-81). Defense counsel's closing argument, as well as the trial court's detailed instructions, thus served to further reduce the likelihood that the jury relied on or was influenced by the prosecutor's remarks in determining petitioner's guilt on the criminal charges.

Therefore, in the context of the entire record, it has not been shown that the failure of petitioner's trial counsel to object to the prosecutor's arguably improper vouching remarks prejudiced the defense as required under the second prong of the *Strickland* test. Even assuming that the Ohio Court of Appeals unreasonably applied *Strickland* in concluding that petitioner had failed to demonstrate that his counsel's performance was "deficient" under the first prong of the *Strickland* test, in the absence of a showing of prejudice under the second prong of the *Strickland* test, petitioner is unable to establish that he was denied the effective assistance of counsel in this case.

Accordingly, in sum, the undersigned concludes that the Ohio Court of Appeals' adjudication of petitioner's ineffective-assistance-of-counsel claim withstands scrutiny under the deferential standard of review set forth in 28 U.S.C. § 2254(d) to be applied in this federal habeas case. It is clear from the record that "it is possible for a fairminded jurist to believe that the state court's rationale comports with the holding in [*Strickland*]." *Peak v. Webb*, 673 F.3d 465, 472 (6th Cir. 2012) (citing *Harrington*, 131 S.Ct. at 786). Because the state courts' adjudication of petitioner's sole ground for relief is neither contrary to nor an unreasonable application of clearly-established federal law as determined by the Supreme Court, petitioner has not demonstrated that he is entitled to federal habeas corpus relief.

### IT IS THEREFORE RECOMMENDED THAT:

1. Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** with prejudice.

2. A certificate of appealability should issue only with respect to the limited issue as to whether petitioner's trial counsel provided ineffective assistance by failing to object to the prosecutor's challenged remark in closing argument essentially vouching for the credibility of the State inmate witnesses. A certificate of appealability should not issue with respect to

petitioner's remaining allegations of ineffective assistance, because they do not rise to the level of a "viable claim of the denial of a constitutional right" and are not "adequate to deserve encouragement to proceed further." *See Slack v. McDaniel,* 529 U.S. 473, 475 (2000) (citing *Barefoot v. Estelle,* 463 U.S. 880, 893 & n.4 (1983)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

3. With respect to any application by petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would be taken in "good faith," and, therefore, should **GRANT** petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity. *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).


Date:  4/23/2012                           s/Karen L. Litkovitz
         cbc                              Karen L. Litkovitz
                                          United States Magistrate Judge

JAYDEE THOMPSON,
    Petitioner

Case No. 1:11-cv-312

vs

Barrett, J.
Litkovitz, M.J.

WARDEN, WARREN
CORRECTIONAL INSTITUTION,
    Respondent

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).